# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Stephen Cornell, | ) | |
| Plaintiff, | ) | Case No: 14 C 2123 |
| | ) | |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| BP America Inc., | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, BP's motion for summary judgment [68] is granted in part and denied in part. With respect to the IWPCA claim as it relates to the Share Value Plan, the Recovery Plan and the severance payment, the motion is granted. To the extent BP seeks summary judgment with respect to the Deferred Annual Bonus, it is denied. Cornell's motion for partial summary judgment as to ERISA preemption [76] is denied as it relates to the Share Value Plan, the Recovery Plan and the severance payment. The parties are directed to appear for a status on October 14, 2015 at 9:30 a.m. to discuss how they intend to proceed with the Deferred Annual Bonus aspect of the IWPCA claim.

## STATEMENT

Plaintiff Stephen Cornell has filed suit against his former employer, BP America Inc. ("BP"), claiming that its failure to pay him severance and other benefits upon his resignation constitutes a violation of the Illinois Wage Payment Collection Act ("IWPCA").

**Facts**

On November 21, 2007, BP extended Cornell a formal offer of employment for the position of Vice President - U.S. Refining. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 90, ¶ 5.)

Cornell's offer letter with BP states in part:

> Although you are an employee "at will" like all other BP US executives, you will be guaranteed employment or at BP's option, equivalent pay and benefits in lieu of active employment, for two years, ending on December 31, 2009, unless you are terminated for good cause or you choose to resign from the Company. In addition, in the event that BP terminates your employment (other than for good cause) before Dec. 31 2011, you will be provided with BP's standard separation package terms as applicable to US executives on US employment terms. Those terms will be no less than the separation terms provided to BP US executives today.
> . . .
> This agreement, as well as all other terms and conditions of your employment, shall be governed by BP Plans, policies and procedures applicable to BP Corporation North America, Inc., except as modified by this agreement.

(Def.'s Resp. Pl.'s Stmt. Facts, Dkt. # 96, ¶ 6.)  The offer letter included a four-page attachment titled "BP Offer: Steve Cornell" that listed the additional elements of Cornell's direct compensation package and did not include any mention of severance benefits.  (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 90, ¶ 8.)

At the time his employment ended on or about January 31, 2014, Cornell was the Chief Operating Officer of Defendant BP America's U.S. Fuels business.  (Def.'s Resp. Pl.'s Stmt. Facts, Dkt. # 96, ¶ 1.)  BP is a corporation doing business in the oil industry, with its principal place of business located in Houston, Texas.  (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 90, ¶ 2.)  At the time he was hired by BP, Cornell wanted to work until he was 65 years old and asked BP about any circumstances that would prevent him from working until he was 65.  (Def.'s Resp. Pl.'s Stmt. Facts, Dkt. # 96,  ¶ 2.)  In his capacity as COO of U.S. Fuels, Cornell was a Band B Group Leader.  (*Id*. ¶ 4.)  As a Band B Group Leader, Cornell was awarded options under BP's Recovery Plan and was granted shares under BP's Share Value Plan.  (*Id*. ¶ 5.)

In August 2013, Cornell was contacted by an executive recruiter about an employment

opportunity at Sasol North America Inc. (Pl.'s Resp. Def.'s Stmt. Fact, Dkt. # 90, ¶ 13.) After

an interview with the Chief Executive Officer of Sasol, Cornell sent an email to the executive

recruiter on October 19, 2013, and attached a document entitled "Cornell Package Expectations."

(*Id*. ¶ 15.) In the "Cornell Package Expectations" document, Cornell wrote:

> Base Salary: My 2014 base with BP (already in the budget) will be $600k. To
> make such a move of this type I would expect a minimum 15% uplift. Thus my
> expectation for a base salary with Sasol is $700k. . . .
>
> Current Commitments by BP: There are two current commitments outstanding
> from BP that Sasol will need to address. The first obligation is three payments of
> $322k each to be paid in July 2014, 2015 and 2016. These payments are in cash
> and associated with my offer letter to join BP. The second obligation is stock
> options currently valued at $500k. These options vest in September 2014 and will
> be forfeited if I leave the Company before this date.

(*Id*.) With respect to the $500,000.00 referenced in the document, Cornell was referring to his

BP Recovery Plan 2011 stock option grants. (*Id*.) On October 23, 2013, Cornell emailed the

executive recruiter again, stating in part as follows: "If I leave BP now my pension value is

$922,582. If I continue to work until I am 65 (which I plan to do) with BP and get normal salary

adjustments, then my pension value will be $2,932,010. So the difference that I need to make

sure is covered through the Sasol pension plan or via some other mechanism is approximately

$2.0 million." (*Id*. ¶ 16.) On November 8, 2013, Sasol offered Cornell a position as Executive

Vice-President: International Operations, with an anticipated start date of February 1, 2014, and

an annual base salary of $650,000. (*Id*. ¶ 17.) Cornell's base salary at BP at that time was

$575,000. (*Id*.)

The Sasol offer of employment provided that Cornell would receive a sign-on payment in

the amount of $750,000.00 provided Cornell stayed with Sasol for three years, and a $500,000.00

deferred sign-on payment payable over a five-year period subject to the achievement of certain agreed-upon milestones. (*Id.* ¶ 17.) Both of these sign-on payments were designed to offset Cornell's loss of $966,000 in sign-on payments from BP from when Cornell left Total, his previous employer, to join BP. (*Id.* ¶ 18.) Cornell accepted the Sasol offer of employment on November 8, 2013. (*Id.* ¶ 19.) When Cornell signed the employment offer letter from Sasol, he understood that part of the package was intended to make up for the pro rata BP Recovery Plan benefit that he might lose. (*Id.* ¶ 22.) Cornell also received from BP upon his departure a "completion payment" of $200,000.00, which he understood to cover part of his loss of BP Recovery Plan stock options. (*Id.* ¶ 32.) In addition, in March 2014, Cornell received from BP, after his departure, a bonus for 2013 in the amount of $589,922.00. (*Id.* ¶ 37.) Cornell's last day with BP was January 31, 2014.

In June 2009, Cornell received an email from Sally Bott ("Bott email"), BP Group Human Resources Director, with the subject "Changes to US Group Leader Severance Terms." (*Id.* ¶ 38.) The Bott email provided, in part, as follows:

> BP's guidelines concerning US Group Leaders are as follows: BP generally offers a separation agreement to US Group Leaders if BP terminates their employment before they planned to retire or resign of their own accord. Instead of participating in a formal severance program with a payment schedule, we use a consistent method to calculate the separation payment. In recent years, that formula has been 1.5 times base salary plus target bonus for Band D and 2 times base salary plus target bonus for Band C and above.
>
> For Group Leader separation agreements entered into from January 1st, 2010, the payment formula will include only base pay, and not target bonus. Band D separation payments will be 1.5 times base salary and Band C and above will be 2 times base salary. This will not affect any agreements currently in place or formally entered into before December 31st, 2009. The new severance formula is very competitive across all industries. We therefore do not expect variances to the formula. In addition, please note that we do not provide a separation payment in

4

the event of a voluntary resignation nor in the event termination arises from serious misconduct, breach of the Code of Conduct, or poor performance.

(*Id.*)

Cornell does not have a signed severance agreement with BP. (*Id.* ¶ 40.) The parties agree that rather than "participating in a formal severance program with a payment schedule," BP uses a "consistent method to calculate the separation payment." (Def.'s Resp. Pl.'s Stmt. Facts, ¶ 20.) BP's lump sum severance paid out to a departing executive does not come from a trust. (Id. ¶ 26.) Any lump sum severance owed to a departing executive comes from the business budget of the division that the executive worked under. (*Id.* ¶ 25.)

Other relevant facts will be discussed in the text of the order as necessary.

**Summary Judgment Standard**

Both Cornell and BP move for summary judgment. When a party files a motion for summary judgment, it is the party's "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009).

**Analysis**

Under the relevant portion of the IWPCA:

> Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee. Where such employee requests in writing that his final compensation be paid by check and mailed to him, the employer shall comply with this request.

820 Ill. Comp. Stat. Ann. 115/5. Further:

> Payments to separated employees shall be termed "final compensation," and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.

820 Ill. Comp. Stat. Ann. 115/2. Wages, in turn, are defined as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." *Id*.

Cornell argues that upon his departure from BP, he was entitled to the standard separation package offered by BP, which included: (a) a lump sum payment of either 2 or 1.5 times the base salary, depending on the Band level of the departing executive; (b) retention of stock grants under the Share Value Plan; (c) retention of the executive's Deferred Annual Bonus; and (d) pro rata retention of options granted under the BP Recovery Plan. According to Cornell, BP's failure to make these payments violated the IWPCA.

Before proceeding to the merits, the Court notes that BP fails to address the Deferred Annual Bonus aspect of the purported separation package in any of its briefing. While it is undisputed that Cornell received a bonus in March 2014 of $589,922.00, it is not clear from the record whether this was, in part or in whole, the Deferred Annual Bonus. Because the Deferred Annual Bonus is not discussed in any detail by either party, the Court cannot address whether it

is preempted by ERISA or if Cornell has any claim to it under the IWPCA.

English Law

As to the BP Share Value Plan and the BP Recovery Plan, each of these documents contains a choice of law provision stating that English law governs. According to BP, this means that Cornell's IWPCA claim must necessarily fail. Cornell first argues that BP has waived this argument by not asserting earlier that English law applied. As an initial matter, the Court notes that Cornell wholly failed to address the English law issue in its reply in support of its motion for for summary judgment, despite BP's discussion of the issue in its response brief, suggesting that Cornell has no argument in reply to BP's assertion. *See MindGames, Inc. v. W. Pub. Co.*, 218 F.3d 652, 659 (7th Cir. 2000) (finding failure to respond in reply brief to argument made by opposing party in response brief "eloquent"). In any event, the Court is not persuaded by the cases cited by Cornell. In *Lott v. Levitt*, 556 F.3d 564, 567 (7th Cir. 2009), for example, the plaintiff expressly agreed in his response to the motion to dismiss that Illinois law applied, but then several months later, tried to assert that Virginia law applied after summary judgment had been granted. That is not the case here. In *CMFG Life Ins. Co. v. RBS Sec. Inc.*, No. 12-CV-037-WMC, 2014 WL 3696233, at *5 (W.D. Wis. July 23, 2014), the party filed an initial motion to dismiss under Wisconsin law then filed a second motion to dismiss under New York law. The Court refused to allow the defendant a "free peek" at how the claims would pan out under Wisconsin law and then take a second bite of the apple under New York law. *Id.* Again, the circumstances here are different as there is no indication that BP sought one ruling under Illinois law, lost, and now seeks a different ruling under English law.

Cornell also argues that the English choice of law provision cannot apply because an

employee cannot waive or release his rights under the IWCPA. Again, however, in the cases

Cornell relies upon, the employees signed express waivers. *See O'Brien v. Encotech Const.*

*Servs., Inc.*, 183 F. Supp. 2d 1047 (N.D. Ill. 2002) (concluding that releases under IWCPA are

void); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2001 WL 1403007, at *7

(N.D. Ill. Nov. 9, 2001) ("[R]eleases under the IMWL and IWPCA as well as the FLSA are void

as a matter of law"). Here, however, no express waiver or release was signed. Moreover, as BP

points out, the Illinois Department of Labor indicates on its website that:

> You may not have a claim . . . [i]f the employment contract has a "choice of law"
> clause requiring you to bring all claims in a state other than Illinois. You must
> pursue your remedies under the choice of law clause in your agreement and the
> Department will defer to that process.[1]

Ultimately, however, absent any discussion of or citation to relevant English law by BP,

the Court cannot make a determination with respect to the effect of English law on this claim.

Perhaps, under a choice of law analysis, English law would allow Cornell to bring an IWPCA

claim regarding the grants provided in the Share Value Plan and the BP Recovery Plan. Because

BP has provided no basis on which the Court can make such a decision, the Court rejects this

argument.

ERISA Preemption

BP next contends that Cornell's claim for compensation under the Share Value Plan, the

BP Recovery Plan, the Deferred Annual Bonus and the severance payment are preempted by

ERISA. ERISA vests the federal district courts with exclusive jurisdiction over actions arising

---

[1] The Court notes that the first sentence appears to refer to a forum selection clause rather
than what it describes as a choice of law provision. Nevertheless, the second sentence appears to
indicate that the Department of Labor believes parties are bound to proceed under the choice of
law as stated in the relevant agreement.

under the employee benefit plans it governs. *See* 29 U.S.C. § 1132(e). In his reply, Cornell notes

that BP admitted that the Share Value Plan, the Recovery Plan, the Bott email and the Deferred

Annual bonus are not ERISA plans, and therefore it cannot assert that they are preempted by

ERISA. Indeed, inexplicably, BP admits in its response to Plaintiff's statement of facts that it is

"undisputed" that those documents are *not* ERISA Plans. (Def.'s Resp. Pl.'s Stmt. Facts, Dkt. #

96, ¶¶ 14-16) (emphasis added.) However, "[f]actual admissions can be binding as judicial

admissions; admissions of legal conclusions cannot." *Sulkoff v. United States*, No. IP

01-1341-C-T/L, 2003 WL 1903349, at *5 (S.D. Ind. Jan. 29, 2003). Thus, the admissions by BP

are not determinative.

       "Case law establishes that an ERISA plan requires an ongoing administrative scheme, and

that its terms must be reasonably ascertainable." *Young v. Am. Junkie River N., LLC*, No. 13 C

8901, 2014 WL 1493354, at *2 (N.D. Ill. Apr. 14, 2014). "Separating ERISA plans from other

benefits arrangements is a 'matter of degrees' and often requires drawing fine distinctions."

*Malone v. Leaf, Inc.*, No. 97 C 168, 1997 WL 583072, at *4 (N.D. Ill. Sept. 12, 1997) (citation

omitted). "[S]imple or mechanical determinations do not necessarily require the establishment of

. . . an administrative scheme; rather, an employer's need to create an administrative system may

arise where the employer, to determine the employees's eligibility for and level of benefits, must

analyze each employee's particular circumstances in light of the appropriate criteria." *Cvelbar v.

CBI Ill. Inc.*, 106 F.3d 1368, 1373 (7th Cir. 1997) (abrogated on other grounds by *Int'l Union of

Operating Eng'rs v. Rabine*, 161 F.3d 427, 430 (7th Cir. 1998)). "One factor to be considered in

deciding 'which obligations are complex enough to require an ongoing administrative program'

is whether the employer's obligation requires managerial discretion in its administration."

*Clevenger v. Securitas Sec. Servs. USA, Inc.*, No. 07-CV-2219, 2008 WL 2168742, at *11 (C.D. Ill. May 22, 2008).

The "Rules of the BP Recovery Plan 2011" ("Rules") is a 16-page document setting forth when a Designated Corporate Officer may grant an Eligible Employee an Option to acquire "such number of Shares as the Designated Corporate Officer may determine." (Def.'s Ex. 12, Dkt. # 71-12, § 1.1.1.) The Rules lay out when Options may be granted, which may be "at any time, subject to the application of Dealing Restrictions." (*Id*., § 1.2.) They further discuss the Designated Corporate Officer's power to adjust the number of Shares included in each Option, under certain circumstances, "in any way . . . which the Designated Corporate Officer considers appropriate," when and how Options may be exercised, and relevant definitions of terms used in the Rules, among other things. (*Id*. §§ 3.1, 4-6, 12.) For example, the Rules detail what happens when an Option vests if an employee is on a "Career Break," which is defined as an "extended period of unpaid leave from normal work . . . and which is designated by the Designated Corporate Officer as a Career Break for the purposes of these rules." (*Id*. § 12.) Similar discretionary rules exist under the Share Value Plan. (*See* Def.'s Ex. 14, The Prospectus and Grant Documents for US Participants B.P. p.l.c. Share Value Plan (2012 Grant), at 3 ("[T]he SVP is a discretionary plan which BP may vary or withdraw at any time"); *id*. ("Under the SVP, BP has granted you a number of Restricted Share Units ('RSUs')" and "[e]ach RSU represents a conditional payment to receive on BP American Depositary Share ('ADS' or 'share') at a date in the future, *provided* that the specified terms and conditions are met") (emphasis in original)); *id*. at 6 ("Participation in the SVP is at BP's discretion"); *id*. at 14 ("The BP p.l.c. Board of Directors ir its duly appointed delegates have authority to make decisions under the SVP.. . . which are

deemed final and conclusive.").) It is clear from a reading of the terms for both the Recovery Plan and the Share Value Plan that not only must BP analyze each employee's circumstances in light of the appropriate criteria to determine the employee's eligibility for and level of benefits, but a certain amount of managerial discretion is required in the administration of the program.

As to the ascertainability of the plan's terms, the Court must determine "whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Cvelbar*, 106 F.3d at 1378 (citation and internal quotation marks omitted). The detailed Rules of both the Recovery Plan and the Share Value Plan satisfy the ascertainability requirement.

Accordingly, the Court finds that the BP Recovery Plan and the Value Share Plans are ERISA plans. The Court's conclusion is not altered by Cornell's claim that BP admitted that Form 5500s were not filed with the United States Department of Labor for those plans. "The filing of a proper form has no bearing . . . on whether a plan is covered by ERISA," and "courts have consistently rejected the argument that the failure to comply with formal requirements can prevent the establishment of an ERISA plan." *Bolssen v. Unum Life Ins. Co. Of Am.*, 629 F. Supp. 2d 828, 882-83 (E.D. Wis. 2009).

ERISA preempts any state-law claim that "relate[s] to" any such employee benefit plan. *See* 29 U.S.C. § 1144(a). A state-law claim relates to an ERISA plan if it "requires the court to interpret or apply [its] terms." *Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir. 1998); *Aurelius v. Jones, Lang, Lasalle, Inc*., No. 04 C 7502, 2005 WL 3042676, at *1 (N.D. Ill. July 11, 2005). In order to determine whether Cornell is entitled to benefits under these plans pursuant to the IWPCA, the Court would be required to interpret the terms of the plans.

Therefore, the Court finds that ERISA preempts the IWPCA claim with respect to the BP

Recovery Plan and the Value Share Plan.

As to a separation agreement and severance payment, pursuant to Bott's email:

> BP generally offers a separation agreement to US Group Leaders if BP terminates their employment before they planned to retire or resign of their own accord. . . . [P]lease note that we do not provide a separation payment in the event of a voluntary resignation nor in the event terminations arises from serious misconduct, breach of the Code of Conduct, or poor performance.

Further, the email stated that "instead of participating in a formal severance program with a

payment schedule, we sue a consistent method to calculate the separation payment."

Specifically, a lump-sum payment is provided, which for Cornell, as a Band B Group Leader,

would be two times his base salary plus the target bonus. BP contends that any IWPCA claim

based on this email is also preempted by ERISA.

Cornell, relying on *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), contends the

separation payment set forth in the Bott email is not preempted by ERISA. *Id.* at 12. In *Fort

Halifax*, the "Supreme Court analyzed whether a Maine statute that required an employer that

closed its plants to pay a one-time lump-sum severance payment to its employees was preempted

by ERISA." *Young v. Am. Junkie River N., LLC*, No. 13 C 8901, 2014 WL 1493354, at *2 (N.D.

Ill. Apr. 14, 2014). The *Fort Halifax* court concluded that application of the Maine statute was

not preempted by ERISA, stating that:

> The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility.

*Fort Halifax*, 482 U.S. at 12.

The facts in this case, however, differ from those in *Fort Halifax*. Here, the Bott email indicates that BP contemplates an ongoing commitment to pay severance benefits whenever BP terminates a Group Leader and it is not for serious misconduct, breach of the Code of Conduct, or poor performance. Further, some managerial discretion is required to determine the reason for the departure and if, therefore, the employee is eligible for a severance payment. In addition, while not elaborate, the terms of an agreement and payments are reasonably ascertainable in regards to eligibility and amount. Accordingly, the Court concludes that the separation payment and severance agreement terms as set forth in the Bott email constitute an ERISA plan. Because Cornell's claim for severance benefits under the IWPCA requires the Court to apply the term set forth in the Bott email, the Court concludes that the separation agreement and severance payment are preempted by ERISA.

For the first time in his reply brief, Cornell asserts that employee stock awards such as BP's Share Value Plan, the Recovery Plan 2011, and the Deferred Annual Bonus are stock option plans that are not governed by ERISA. However, arguments raised for the first time in a reply brief are waived. *See U.S. v. Peel*, 668 F.3d 506, 508 (7th Cir. 2012) (arguments raised for the first time in reply brief are waived). Moreover, Cornell's argument in this respect, while plausible, is perfunctory and undeveloped. Because Cornell raised the issue for the first time in a reply brief and provided only a superficial discussion in support, the argument is waived. The Court further notes that the lack of input from BP (due to the argument having been raised for the first time in Cornell's reply) on what is a fact-specific and potentially nuanced issue deters a proper determination by the Court.

However, even if the claims related to the the Share Value Plan, the BP Recovery Plan,

13

and the severance payment are not ERISA plans and are therefore not preempted, as Cornell contends, they would fail under the IWPCA.

IWPCA

Cornell asserts that the agreement under the IWPCA in this case are the "actions and statements of its executives . . . together with the relevant documents." (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. & Support Partial Mot. Summ. J., Dkt. # 80, at 1.) "Illinois courts have interpreted the term 'agreement' to be broader than a contract and to require only a manifestation of mutual assent." *Enger v. Chicago Carriage Cab Co.*, 77 F. Supp. 3d 712, 716 (N.D. Ill. 2014) (citations omitted).

The contours of the alleged agreement under the IWPCA are not entirely clear. According to Cornell, he and BP had an "agreement that differed from the Company's formal written policies." (Pl.'s Mem. Opp. Def.'s Mot. Summ. J., Dkt. # 80, at 6.) Specifically, Cornell refers to the following in contending that he and BP had a verbal agreement:

- BP's "highest level executives routinely referred to the standard package in correspondence among themselves (including Cornell) when discussing potential separation benefits for departing employees" (*id*.);

- Andrew Ditty, BP's Head of Human Resources, and Helmut Schuster, Executive Vice-President of Human Resources, "verbally promised Cornell at the outset of his employment that he would be treated the same as all other departing executives if his employment with BP ended" (*id*. at 7);

- Ditty and Schuster "assured Cornell that he would receive the same standard separation package [as other departing executives]" (*id*.);

- "[D]uring a Human Resources Sub-Committee ('HRSC') meeting on July 17-18, 2013, which Cornell attended, BP specifically announced that the employment terms, including the terms and eligibility for a severance package, shall remain the same going forward for Group Leaders Band

14

B,C, and D as long as they remain in their current band." (*id*.)

Even assuming the truth of these statements and actions, none of these demonstrates assent on BP's part that, regardless of the circumstances of his departure or his eligibility under the terms of the relevant plan or severance payment, he would receive those benefits without question. In other words, a statement that he would "receive" the same standard separation package or be treated like other departing executives does not establish that he had an agreement for a guaranteed payment under the various plans and severance payment terms without reference to eligibility requirements.

This conclusion is supported by Cornell's selective disavowal of the "formal written documents." Specifically, although he refers to "formal written documents" as part of the agreement, he rejects that the terms of the policies actually apply to him. Cornell contends that his "right to the standard separation package stems from BP's verbal promises, informal correspondence, and other actions – *which together with the formal documents* form the basis of the parties' agreement." (*Id*. at 9) (emphasis added). However, when BP argues that Cornell does not qualify for any of the benefits he seeks under the express terms of the formal documents, Cornell *rejects* reliance on those documents as "misplaced, as these documents do not accurately reflect BP's actual practice for awarding separation benefits, or incorporate the verbal promises made to Cornell." (*Id*. at 8.) Thus, as noted by BP, Cornell apparently wants the benefits provided under the formal plan documents but contends that the documents should be disregarded to the extent they establish that he is not actually entitled to those benefits. Not only is this argument illogical, but Cornell points to no record evidence establishing that this was the agreement between the parties.

15

Cornell goes on to argue that the formal plan documents do not foreclose a finding that Cornell and BP had come to a separate agreement to pay Cornell the standard separation package. In support, Cornell notes that the BP Recovery Plan 2011 states that "the rights and obligations arising from the employment relationship are separate from, and are not affected by the Plan" and that the Share Value Plan states that "your participation in the SVP does not constitute or form a part of any contract of employment." (*Id*.) But BP is not arguing that the plan documents foreclose another agreement; it is asserting that no other agreement existed.

Indeed, even assuming that an agreement existed to provide Cornell the "standard separation package," he is not entitled to benefits under the individual elements that purportedly make up the standard separation package.[2]

The June 2009 Bott email provides that BP "generally" offers separation payments but expressly states that BP does *not* provide separation payments in the event of a voluntary resignation. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 87 , ¶ 38.) Moreover, it is undisputed that at the time Cornell left BP, none of his options under the BP Recovery Plan had vested, and he understood that his entitlement to benefits under the BP Recovery Plan was subject to the terms of the plan and that BP had made a final and conclusive determination, according to the terms of the plan, that Cornell was not entitled to any Recovery Plan benefits. (*Id*. ¶ 56.) Specifically, the Option Agreement Under the BP Recovery Plan 2011 (US Optionholders), which is applicable to Cornell, provided that if he ceased to be employed by BP before the vesting date, his options would lapse unless his employment ended due to disability or involuntary termination, in which

---

[2] Again, because none of the terms of the Deferred Annual Bonus are discussed by the parties, the Court does not address the parties' arguments as they relate to the Deferred Annual Bonus.

case his options would be reduced pro rata to reflect the period during which he was not an employee.  (*Id*. ¶ 53.)  The Recovery Plan Option Agreement defines "involuntary termination" as "termination of your employment by your employer" or "a termination considered by the Designated Corporate Officer to have been initiated by your employer, in both cases where the termination is not based on your conduct or performance."  (*Id*.)  Cornell admits that BP did not tell him he was terminated at the time of his separation.  (*Id*. ¶ 33.)

In addition, the Prospectus and Grant Document for US Participants BP p.l.c. Share Value Plan states that if an individual ceases to be an employee of BP before the vesting date, then he will forfeit his shares, unless his employment with BP is terminated as a result of an involuntary termination of employment.  (*Id*. ¶¶ 56, 66.)  Cornell was awarded grants under the Share Value Plan in 2012 and 2013, but each award included a vesting period of three years.  (*Id*. ¶¶ 63, 65.)  Therefore, at the time of Cornell's departure in January 2014, none of his Share Value Plan awards had vested and were therefore forfeited.   The Prospectus and Grant Document gave BP *sole discretion* to waive the general forfeiture provision under certain circumstances and, as previously noted, specifically states that the Share Value Plan "shall not form any right for any contractual purpose."  (*Id*. ¶¶ 67, 70) (emphasis added).  In light of these provisions, any contention by Cornell that he is entitled to separation payments or benefits under the BP Recovery Plan or the Share Value Plan are unavailing.

Cornell attempts to circumvent the terms of the plans and the separation payment discussed in Bott's email by arguing that he did not resign; rather, BP constructively terminated him by forcing him to resign.   "An employer constructively discharges an employee 'only if it makes an employee's working conditions so intolerable that the employee is forced into an

involuntary resignation.'"  *Cohn v. Guaranteed Rate Inc.*, No. 14 C 9369, 2015 WL 5307625, at

*8 (N.D. Ill. Sept. 10, 2015) (citation omitted).

      The Seventh Circuit notes that:

> Our circuit has recognized two different forms of constructive discharge. . . . In
> the first form, an employee resigns due to alleged discriminatory harassment.
> . . .
> The second form of constructive discharge we have recognized occurs "[w]hen an
> employer acts in a manner so as to have communicated to a reasonable employee
> that she will be terminated." . . . This form of constructive discharge, however,
> does not eliminate the need for the plaintiff to show that his working conditions
> had become intolerable.

*Chapin v. Fort Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (internal citations omitted).

Cornell does not allege discrimination; therefore, the first type does not apply.  As to the second,

Cornell points to insufficient evidence from which a jury could conclude that BP was going to

terminate him or that his working conditions had become intolerable.

      The two cases Cornell cites in support are inapposite.  In *Neal v. Honeywell, Inc.*, 191

F.3d 827  (7th Cir. 1999), the court concluded that a jury could find that the plaintiff, a

whistleblower, had been constructively discharged:

> [Plaintiff], who holds a Ph. D. in "Organizational Behavior," worked for two
> years at Honeywell, during which she coordinated training, helped departments to
> resolve disputes and systemic morale problems, evaluated employees'
> productivity, wrote the plant-wide newsletter and ghost-wrote management
> communications, and conducted surveys. After blowing the whistle, she was left
> with only the occasional training duty, and (ironically) the responsibility for
> drafting a new discipline policy.  For a highly educated employee, such a drastic
> diminution of duties might suffice as a "constructive discharge."
>
> [Plaintiff's] theory rests on more than just the reduction in her responsibilities,
> however.  Her immediate supervisor made her feel like a traitor for ratting on
> fellow employees.  Worse, [Plaintiff] worried that Honeywell would not be able to
> guarantee her safety at work.

*Id*. at 830-31.  Cornell has not pointed to such drastic circumstances in his case or even a

significant diminution in duties.  It is undisputed that Cornell, as COO of U.S. Fuels, oversaw the

sale of two refineries (also referred to as Strategic Performance Units or "SPUs") during his

tenure, thus reducing the number of SPUs for which Cornell had responsibility from four to two.

(Def.'s Resp. Pl.'s Stmt. Add'l Facts, Dkt. # 97, ¶ 20.)  However, his supervisor, Iain Conn,

Chief Executive Officer of Refining and Marketing, testified that "the asset base [of the U.S.

Fuels business] today is larger than it was before [BP] sold the two refineries" and that "[t]oday,

the U.S. Fuels business, if standalone, would be a Fortune 500 Company."  (*Id*.)  Indeed, for

2014, Cornell was slated to receive a $25,000.00 raise.

In any event, Cornell admits that during discussions he had with Conn in 2013 about

Cornell's future, Conn mentioned Cornell as a possible candidate to run BP's Petrochemical

business, which was another Band B position.  (*Id*. ¶¶ 24-25.)  While Cornell refers to the move

to the Petrochemical unit as a "demotion" because it involved running only one SPU and may

have required a move to Shanghai, Conn testified that it was a "large" SPU.  More importantly,

Cornell points to no specific evidence in support of his contention that the position would be a

demotion.  Further, Cornell refers to no evidence that BP had definitively made a decision

regarding his future at BP, let alone that his termination was imminent.  Finally, while it is

undisputed that Conn told Cornell that he did not see him as a candidate for BP's Executive

Management Team, providing an employee with a frank evaluation of his potential (or lack

thereof) for progression to higher-level positions is not the same thing as indicating that the

employee will be terminated.  *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the

United States of Am.*, 48 F. Supp. 3d 1054, 1117 (N.D. Ill. 2014) ("[C]ourts have held that an

employer has not effected a constructive discharge because an employee believes that she has lost respect or credibility within the company or that she has limited opportunity for advancement.") (internal quotation marks and citations omitted).

Nor is *Seisser v. Platz Flowers and Supply, Inc.*, 129 F. Supp. 2d 1130 (N.D. Ill. 2000), also cited by Cornell, on point. In that disability discrimination case, the court addressed whether an adverse action had taken place. An employee who developed health problems was told by her boss that he thought she should take "early retirement," and when she asked if there were any other options, he said "no." *Id.* at 1133-34. Moreover, on the employee's termination report, her boss checked "termination" instead of "resignation" or "mutual agreement." Thus, the court found a genuine issue of material fact as to whether she had been forced to resign. No such facts exist here.

Because no facts support a finding that Cornell's firing was an "imminent and inevitable event," the Court finds that no reasonable jury could conclude that Cornell was constructively discharged. *Chapin v. Fort Rohr Motors, Inc.*, 621 F.3d 673, 681 (7th Cir. 2010) ("To find that one singular threat [of termination], followed by multiple reassurances that the employee has retained his job, was a constructive discharge is to lower the threshold of the 'intolerable' workplace so far as to be unrecognizable."). Here, there was not even a threat of termination. On the contrary, Cornell admits that he discussed his "future" at BP with Conn several times during 2013, and at no time was termination mentioned or discussed.[3] Therefore, even if one

---

[3] The Court further notes it is undisputed that on the same day Cornell told Conn that he was leaving BP to take a job with Sasol, Conn sent Cornell a text stating, "I am presuming there is no point in trying to talk you out of it? That was my clear sense. Hence, I didn't try to. Let me know if that's not the case." Cornell responded stating,"I have thought deeply about this decision and am comfortable it is the better path for me and my family. So no, I am really not

could construe the various components of the separation agreement as permitting benefits in the event of a constructive discharge, an issue that this Court does not address, Cornell has failed to establish a genuine issue of material fact as to whether such a constructive discharge occurred.

Finally, Cornell's assertion that he is entitled to separation pay and benefits under the IWCPA because other executives received them is unpersuasive. BP's agreements or conduct with respect to other employees does not bind BP to the same terms with Cornell. *Stark v. PPM Am., Inc.*, 354 F.3d 666, 672 (7th Cir. 2004) (rejecting plaintiff's contention that "past practice constitutes a contract" under the IWCPA and noting that plaintiff was "'trying to . . . use the employer's practice 'not to explicate a contract but to create one'") (citation omitted).

---

interested in a conversation about staying. I do appreciate the thought." (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 87, ¶ 25.) In addition, on December 5, 2013, Cornell sent an email to Sasol's CEO, notifying him that the news of Cornell's departure from BP had been made public and that it was a "shock to most of BP." (*Id*. ¶ 29.) Finally, it is undisputed that during a December 2013 conversation between Cornell and Conn regarding a $200,000.00 payment BP was making to Cornell to partially compensate him for part of the Recovery Plan that Cornell was forfeiting, Conn told Cornell there were "serious consequences for someone who leaves BP to join another company and all other elements of the separation package . . . would be forfeited." (*Id*. ¶ 49.) These comments do not indicate circumstances supporting a constructive discharge.

**Conclusion**

For the reasons stated above, BP's motion for summary judgment is granted in part and denied in part. With respect to the IWPCA claim as it relates to the Share Value Plan, the Recovery Plan and the severance payment, the motion is granted. To the extent BP seeks summary judgment with respect to the Deferred Annual Bonus, it is denied. Cornell's motion for partial summary judgment as to ERISA preemption is denied as it relates to the Share Value Plan, the Recovery Plan and the severance payment.

**Date**: September 30, 2015

**Ronald A. Guzmán**
**United States District Judge**